**IN THE COURT OF APPEALS OF IOWA**

No. 21-0823
Filed March 2, 2022

IN RE THE MARRIAGE OF JESSICA PECKUMN
AND THOMAS PECKUMN

Upon the Petition of
**JESSICA PECKUMN,**
     Petitioner-Appellee,

**And Concerning**
**THOMAS PECKUMN,**
     Respondent-Appellant.
_____

Appeal from the Iowa District Court for Greene County, Adria Kester, Judge.


A former husband appeals the division of assets and physical-care provision

in the decree dissolving his marriage. **AFFIRMED AS MODIFIED.**


Joel Baxter of Wild, Baxter & Sand, P.C., Guthrie Center, for appellant.

Kate Simon of Cordell Law, LLP, Des Moines, for appellee.


Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Jessica and Thomas Peckumn divorced after a seven-year marriage. The decree awarded physical care of their two children, ages two and four, to Jessica. In dividing their property, the district court awarded roughly seventy-five acres of farmland to Thomas. To achieve an equitable distribution, the court then directed him to pay $325,802.48 to Jessica. Thomas now challenges that equalization payment and the physical care award.

Because the district court's distribution was fair under the circumstances of this marriage, we reject Thomas's argument about the fortuitous appreciation of the farm property. But we reduce the equalization payment to $302,065.46 to reflect minor miscalculations of the non-real estate assets, as well as taxes and advance attorney fees paid by Thomas. And, to promote continuity of caregiving during the marriage, we affirm the physical care award to Jessica.

## I.    Facts and Prior Proceedings

Jessica and Thomas married in 2014. Both had college degrees. Thomas studied agriculture and agronomy. Jessica majored in children and family studies. They have two sons, J.T.P. born in 2016 and J.H.P born in 2019.

When she petitioned for divorce in April 2020, Jessica was working as an executive assistant at the Greene County Medical Center in Jefferson. In that position, she worked forty to fifty hours per week and earned $42,000 per year. But in July 2020 she lost that job—told by her boss that she "wasn't reliable during the pandemic." She testified that she had to take leave from work when their daycare closed three or four times because of COVID-19 or when the children had to quarantine. Jessica testified that she asked Thomas for help with child care, but

he declined. Despite her diligent efforts, she had not found a comparable position in Jefferson by the time of the divorce trial in April 2021. Jessica testified that she planned to move to Des Moines to secure a new job.

Thomas works in agriculture with his father, though they maintain separate farming operations. Thomas calculated his annual income from farming as $69,358, an amount that the district court accepted as accurate.

Before the marriage, Thomas bought three parcels of land: ten acres in 2007, thirty-nine acres in 2009, and twenty-six acres in 2010. Working from Thomas's 2013 statement of his net worth, the district court found that when he entered the marriage, his equity in those properties was $118,750.43. Then working from Thomas's January 2021 balance sheet, the court determined the equity in those properties had grown to $445,988. When dividing the marital estate, the court set off the $118,750.43 in premarital equity to Thomas. But the court decided the rest of the increased equity ($327,237.57) should be divided equally between Thomas and Jessica. The court completed a detailed balance sheet awarding those properties and the marital home (valued at $42,000) to Thomas, as well as dividing the couple's non-real estate assets. As its bottom line, the court ordered Thomas to make an equalization payment of $325,802.48 to Jessica. The court allowed Thomas to pay that amount in installments.[1]

Thomas contests that property division on appeal. He also challenges the district court's decision to place physical care of the children with Jessica. For defending the decree on appeal, Jessica asks for roughly $2000 in attorney fees.

---

[1] The court declined Jessica's request for spousal support.

## II.     Scope and Standards of Review

We review appeals from dissolution decrees de novo.  Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018).  We give weight to the district court's fact findings, but, in the end, we make our own assessment of the record.  *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

"No hard and fast rules govern the economic provisions in a dissolution action; each decision turns on its own uniquely relevant facts."  *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998).  With that understanding, we will disturb the court's resolution of disputed claims only if the decree fails to do equity.  *Id.* When physical care is at issue, our primary consideration is the best interests of the children.  *In re Marriage of Hansen*, 886 N.W.2d 868, 874 (Iowa Ct. App. 2016).

## III.     Legal Analysis

## A.     Equalization Payment

Thomas contends the district court erred in calculating his equalization payment.  He agrees with the court's decision to set off $118,750.43—the amount of equity he had in the farmland coming into the marriage.  And he concedes Jessica has a right to share in the value of the property that appreciated based on their joint marital efforts.  But he objects to the court's decision to evenly split those increases in the land's equity stemming from its "fortuitous appreciation."

When deciding how to equitably divide property owned by one spouse before the marriage that has appreciated during the marriage, we emphasize three factors: (1) each spouse's tangible contributions to the marital relationship; (2) whether the property's appreciation is attributable to the spouses' joint efforts or fortuitous circumstances; and (3) the length of the marriage.  *In re Marriage of*

*Grady-Woods*, 577 N.W.2d 851, 852–53 (Iowa Ct. App. 1998). We also consider the statutory factors including the age and physical and emotional health of the parties, as well as their earning capacities and economic circumstances. *Id.* (citing Iowa Code § 598.21).

In seeking to reduce his equalization payment, Thomas relies on the analysis in *In re Marriage of Lattig*. 318 N.W.2d 811, 815 (Iowa Ct. App. 1982). That case recognized that when one party brings property into the marriage, and that property increases in value, the other party is not necessarily entitled to one-half the difference without showing contributions to the enhancement of value by joint effort, skill, or funds. *Id.* at 816.

Thomas is correct in noting similarities between *Lattig* and this case. For instance, Richard and Shirley Lattig had also been married just seven years. And as Thomas describes: "The marital estate in *Lattig* included farmland that was brought into the marriage by one spouse. The property had appreciated in value in part due to fortuitous circumstances and in part due to the efforts of both parties." *Lattig* held that the district court's formula for awarding Richard four-sevenths and Shirley three-sevenths of the increased value of the land he brought into the marriage was faulty. *Id.* at 815. On the one hand, our court noted, the property was not jointly held and Shirley did not make any payments on the farm. *Id.* On the other hand, she did guarantee a loan for farm equipment and did help on the farm for a short period before she began working full time.[2] *Id.* at 816. Reasoning

---

[2] Shirley and Richard did not have any children in common. Shirley testified that she spent most of her own paychecks to support her four school-aged children from a previous marriage. *Lattig*, 318 N.W.2d at 813–14.

that Shirley should receive some credit for her "risk under the loan agreement" and her "contributions to the marriage," our court reduced Shirley's award from $68,297 to $25,000. *Id.*

Claiming to apply the logic of *Lattig*, Thomas contends it was inequitable for the district court to divide the land's increased value of $327,237.57 because—in his estimation—at least $246,500 of that amount was "fortuitous appreciation." It is hard to track Thomas's calculations because he cites mainly to the decree, not the transcript or exhibits, to support his figures.[3] But as his bottom line, Thomas asserts his equalization payment to Jessica should fall in the range of $124,132 to $134,224—less than half of the $325,802 ordered by the district court.

To counter, Jessica argues the facts of *Lattig* differ from this case. For one thing, before she was fired, her earnings supported the growth in equity of the properties. Even Thomas testified: "Jessica did contribute to paying the mortgage on these farms during our marriage and that needs to be taken into account." While the three parcels were not jointly held, the bank required Jessica to sign security agreements. In another departure from *Lattig*, Jessica and Thomas have two children in common and she was the primary caretaker, even though she also worked full-time outside the home. In fact, she lost her job because of her absences caring for their children during the pandemic and Thomas's refusal to lend a hand. Jessica insists the district court gave appropriate consideration to the economic value of her contribution to the marriage through both her income and

---

[3] From what we can tell, Thomas disagrees with the district court's decision to use his own statement of his net worth to determine the premarital value of the parcels.

provision of health insurance, as well as her homemaking and childcare services. *See* Iowa Code § 598.21(5)(c).

We agree with Jessica. We find it equitable given the circumstances of this marriage to evenly divide the appreciated value of the premarital property. We need not emphasize how the property appreciated "fortuitously versus laboriously." *See In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007). We recognize that in *Fennelly*, our supreme court deemphasized that distinction in a marriage of nearly fifteen years. *Id*. But even in this marriage of seven years, the manner of appreciation does not dictate a different outcome. Like the parties in *Fennelly*, both Thomas and Jessica "contributed in countless ways to the marriage." *Id*. If either party can be accused of shirking duties, it would be Thomas, having refused to help with childcare after the pandemic disrupted the normal routine.

While we endorse the district court's attempt to equally divide the parties' assets, we modify based on three inaccuracies conceded in Jessica's brief: (1) the balance in her health savings account transposing a decimal;[4] (2) an accounting of her IPERS benefits;[5] and (3) the value of Thomas's work truck.[6] The district court calculated the marital estate at $711,250.18 with each party receiving half, or $355,625.09. With the net adjustments of $24,318.96, the total marital estate is $686,931.22—divided by two is $343,465.61. The adjustments change the net

---

[4] The value is $264.31, not $26,431, removing $26,166.69 from the marital estate. And as Thomas suggests, it is more appropriate to award this asset to Jessica.
[5] The value is $20,170.34, not $18,822.61, adding $1347.73 to the marital estate.
[6] The value is $1000, not $500, adding $500 to the marital estate.

In addition, we decline to modify based on Thomas's claim that the district court double counted a government payment of $28,000 because the parties' stipulation contradicts that assertion.

value of Thomas's distribution from $681,427.57 to $655,496.57 and Jessica's distribution from $29,822.61 to $31,434.65. Based on those new figures, we calculate Thomas's equalization payment at $312,030.96.

We further reduce that amount to reflect two expenditures made by Thomas: $4000 in fees for Jessica's trial attorney and $5965.50, Jessica's share of their 2020 tax bill. After those deductions, Thomas owes Jessica an equalization payment of $302,065.46. The installment plan outlined in the decree will remain in place.

### B.    Physical Care

Thomas argues that the court should have granted him physical care of their sons. In making a physical-care determination, we focus on the best interests of the children. *Fennelly,* 737 N.W.2d at 101. That focus is informed by the factors in Iowa Code section 598.41(3) (2021). *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (applying section 598.41(3) to physical care decisions). We also consider the characteristics of the children and their parents, the children's needs and the parents' ability to meet them, the relationships between the parents and children, the effect of continuing or disrupting an existing physical care arrangement, the nature of each proposed environment, and any other relevant matter revealed in the evidence. *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974).

Neither Thomas nor Jessica asked for joint physical care. Rather, both parents asked to be the physical caretaker. To support her request, Jessica testified that she had filled that role since the births of the children. Even when she was employed outside the home, she was the parent who took off work when

the children were ill or other issues arose. As a self-employed farmer, Thomas spent long hours working, especially in the spring and fall.

Thomas did not dispute her testimony, acknowledging that she was "a very good mom." Instead, he testified that he had hoped that if he agreed to Jessica having physical care that "she would stick around versus moving to Des Moines so [he] could see [his] kids more even if she was primary." But upon learning that Jessica intended to move, he sought physical care. In his words: "Knowing my boys, how they are at the farm, . . . I just think it would be devastating for them to move at this point." Thomas said he would rely on his family members to watch the boys when he needed to do farm work.

The district court found both Thomas and Jessica were good parents and would be suitable caregivers. But Jessica's established pattern of attending to the children's day-to-day needs tipped the scales. The court believed "continuation of the currently established custodial arrangement" would be in the boys' best interests. In reaching that determination, the court considered Jessica's anticipated move away from Greene County.

Like the district court, we conclude that the continuity of caregiving is the key factor. *See Hansen*, 733 N.W.2d at 696. The boys' emotional bonds with Jessica outweigh any disruption that will accompany her expected relocation. *See In re Marriage of Thielges*, 623 N.W.2d 232, 236 (Iowa Ct. App. 2000) (placing greater importance on the stability of relationship between children and their primary caregiver than on physical setting). We affirm the grant of physical care to Jessica.

### C.     Appellate Attorney Fees

Jessica seeks appellate attorney fees of $1967.  We do not award appellate attorney fees as a matter of right.  *In re Marriage of Towne*, 966 N.W.2d 668, 680 (Iowa Ct. App. 2021).  Rather, we exercise our discretion, weighing the needs of the party seeking the award, the other party's ability to pay, and the relative merits of their arguments on appeal.  *Id.*  Although Jessica has largely succeeded in defending the decree on appeal, given Thomas's obligation to make significant equalization payments, we find it more equitable for each party to pay their own fees.  Costs will be divided equally.

**AFFIRMED AS MODIFIED.**